**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

Kolin B. Bernard,

               **Plaintiff,**         **Civil Action No. 11-12951**

      **vs.**               **District Judge Thomas L. Ludington**

**Commissioner of Social**      **Magistrate Judge Mona K. Majzoub**
**Security,**

               **Defendant.**

_____/

## REPORT AND RECOMMENDATION

Plaintiff Kolin B. Bernard has filed this civil action seeking judicial review of Defendant the Commissioner of Society Security's determination that he is not entitled to social security disability benefits. (Dkt. 1.) *See* 42 U.S.C. § 405(g), 42 U.S.C. § 1383(c). Before the Court are the parties' motions for summary judgment. (Dkt. 11, 13.)

The Court has been referred these motions for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (Dkt. 3.) The Court has reviewed the pleadings, dispenses with a hearing, and issues this report and recommendation.[1]

## I.    Recommendation

Because the Court recommends finding that substantial evidence supports the ALJ's RFC, that the ALJ did not err when he did not present a detailed analysis of "other source" statements, and that the ALJ did not err when he did not inquire into discrepancies between the vocational expert's

_____

[1]The Court dispenses with a hearing pursuant to Eastern District of Michigan Local Rule 7.1(f)(2).

1

testimony and the Dictionary of Occupational Titles, the Court recommends denying Plaintiff's motion for summary judgment, granting Defendant's motion for summary judgment, and dismissing this case.

## II.    Report

### A.    Facts

#### 1.    Procedural facts

On November 6, 2006 Plaintiff applied for disability and disability insurance benefits and supplemental security income benefits.  (AR at 19.)  Plaintiff alleged that he became disabled on August 19, 2004.  (*Id.*)  The claims were initially denied on March 12, 2007.  Plaintiff then requested a hearing with an ALJ.  On July 15, 2009 the ALJ held that hearing.  (*Id.*)  On September 12, 2009 the ALJ denied Plaintiff's request for benefits in a written decision.  (*Id.* at 16.)  Plaintiff sought review.  On May 19, 2011 the Appeals Council denied Plaintiff's request for review.  (*Id.* at 1.)  On July 8, 2011 Plaintiff filed this case seeking judicial review of that final decision.  (Dkt. 1.)

#### 2.    The ALJ's written decision

On September 12, 2009 the ALJ issued his written decision denying Plaintiff's request for benefits.  Relevant to this case, the ALJ found that Plaintiff had cognitive disorder and mood disorder.  (AR at 22.)  The ALJ held, though, that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments.  (*Id.*)

The ALJ then reviewed the Paragraph B criteria of Listings 12.04 and 12.08.[2]  (AR at 24.)

---

[2]These factors are the factors that 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00 Mental Disorders requires Defendant to analyze when determining whether a claimant's mental disorder is severe and limits the claimant's ability to perform substantial gainful activity.  Paragraph B

2

In social functioning, the ALJ stated that Plaintiff had moderate difficulties. (AR at 24.) The ALJ stated that the record did not contain evidence that would show that Plaintiff had greater difficulties in social functioning. (*Id.*) The ALJ reviewed a July 2009 statement from a Washtenaw Community College official that mentioned that students complained about Plaintiff's disruptive behavior in the classroom. (*Id.*) But the ALJ pointed out that the statement did not contain "detailed information that would support a finding of a greater level of limitation tha[n] specified here." (*Id.* at 24-25.) The ALJ also stated that a letter from Plaintiff's former employer included descriptions of "inappropriate and aggressive behavior in the workplace, but [did] not support a finding that [Plaintiff's] social limitations are at a level of severity that is greater than indicated here." (*Id.* at 25.) The ALJ noted that Plaintiff's former employer complained of professional as well as personal issues. (*Id.*) The ALJ also pointed out that the former employer did not provide detailed information about Plaintiff's behavior, "other than to state that [Plaintiff] attempted to provoke a physical altercation, and that his work associations ended with threats and disagreements." (*Id.*)

---

requires Defendant to assess the claimant's functional limitation using four criteria: activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. *Id.* For Section 12.04 affective disorders, the requisite severity is met when the claimant shows that he has two of the following: 1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration. *Id.* at 12.04(B). A plaintiff can also meet the 12.04 listing by establishing the 12.04 Paragraph C criteria: "Medically documented history of a chronic affective disorder or at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: 1. Repeated episodes of decompenstaion, each of extended duration; or 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement." *Id.* at 12.04(c).

The ALJ noted that Plaintiff testified that he had been incarcerated and that he was on probation, but the ALJ stated that "incarceration and probation are not indicative of a level of restriction in social functioning that is greater than determined here."  (*Id.*)

Regarding concentration, persistence or pace, the ALJ stated that Plaintiff had moderate difficulties.  (AR at 25.)  The ALJ stated:

> [t]he residual effect of traumatic brain injury, and [Plaintiff's] cognitive disorder and mood disorder reasonably cause moderate limitations in concentration, persistence or pace.  Nevertheless, the [RFC] adopted here accommodates his limitations in this area by providing for work that does not require more than simple, routine, repetitious tasks, with one-or two-step instructions and that also does not require strict production quotas.

(*Id.*)

The ALJ then stated the RFC:

> I find that [Plaintiff] has the [RFC] to perform work at any exertional level that does not require: more than simple, routine, repetitious tasks, with one- or two-step instructions; or strict production quotas, defined as the requirement to produce a specified number of units of work in a specified period of time; or more than occasional contact with coworkers, supervisors, or the public.

(AR at 25.)

The ALJ reviewed the evidence he considered in crafting the RFC.  The ALJ stated that Plaintiff alleged that his brain injury "resulted in significant memory loss and mood disturbance which affect interpersonal relationships and his ability to work."  (AR at 26.)  The ALJ then stated that Plaintiff testified that he had problems with focusing and concentrating that prevented him from being able to stay on task.  (*Id.*)  The ALJ stated that Plaintiff also testified that he became short tempered and that he did not feel as if he was capable of doing full-time work.  (*Id.*)

The ALJ pointed out that Plaintiff's treatment for his mental impairments "has been essentially conservative."  (AR at 27.)  The ALJ explained, "[a]lthough the record indicates ongoing

problems and treatment for his mental health impairments, that treatment has also been conservative." (*Id.*)

The ALJ stated that he also reviewed a December 2006 statement from John Loring, a social worker who worked with Plaintiff. (AR at 27.) The ALJ noted that Loring mentioned that Plaintiff had sleep problems and that he was unaware that Plaintiff needed treatment for his mental illness resulting from his head injury. (*Id.*) The ALJ then noted that records showed that Plaintiff was noncompliant with taking the medication that was prescribed as a part of his mental health treatment. (*Id.*)

The ALJ noted that Plaintiff was able to still complete several semesters of school since his alleged disability and that he earned twenty-one credit hours and had a grade point average of 3.62. (AR at 23.)

The ALJ then stated that Plaintiff stated that "he [wa]s not capable of sustaining simple, repetitive work because of his desire to do more." (AR at 28.) The ALJ then stated that Plaintiff's statement was not convincing because Plaintiff stated that he lived "independently" and took care of "some day-to-day activities." (*Id.*)

The ALJ stated that he gave significant weight to the state agency psychological assessment, which, he maintained, was for the most part consistent with the crafted RFC. (AR at 28.) But the ALJ held that the expert opinion understated Plaintiff's capability with respect to Plaintiff's ability to carry out activities of daily living. (*Id.*) The ALJ stated that he discounted the state agency's opinion based on Plaintiff's own testimony. (*Id.*)

The ALJ reviewed the vocational expert's testimony. (AR at 29.)

Plaintiff's counsel questioned the vocational expert about "requirements for paying attention

to carry out tasks[.]" (AR at 29.) The ALJ reviewed that the expert stated that "to sustain work, a worker must pay attention, but simple routine tasks would only require remembering short, simple tasks." (*Id.*) The ALJ held that he did not find that Plaintiff "has shown that he is not capable of sustaining work within the RFC adopted[.]" (*Id.*)

The ALJ directed a finding of "not disabled." (*Id.*)

### 3. July 15, 2009 hearing

Plaintiff testified that he lived by himself. (AR at 53.) He stated that he was currently enrolled at Washtenaw Community College, albeit taking one class at the time of the hearing. (*Id.*) The ALJ asked about Plaintiff's prior and current working condition. (*Id.* at 54.) Plaintiff's attorney explained Plaintiff's former working situation and Plaintiff's most recent failed attempt at housepainting and his relationship with that employer, Harlan Thomas. (*Id.*)

Plaintiff stated that he had a driver's license, but that he did not drive because he did not have a car. (*Id.* at 54.)

Plaintiff stated that he was able to "keep a stable living environment." (AR at 57.) He stated that he could do the dishes and the "day-to-day stuff." (*Id.*) He did state that he had help from his father, at times, with upkeep and with getting to doctor's appointments. (*Id.*)

The hearing testimony shows that Plaintiff was currently on Invega, and anti-psychotic medication. (AR at 59-60.) Plaintiff testified that a side effect of the medication was that he became "[e]xtremely tired." (*Id.* at 60.)

Plaintiff testified that he was not able to keep a regular job because of his "[f]airly short-temper[.]" (AR at 60.) He added that he tended to feel capable of a lot more than others thought he was capable of. (*Id.*) As a result of those feelings, he stated that he could become disappointed and

6

"react adversely." (*Id*.) He stated that "[f]ocus and concentration [were] definitely lacking." (*Id*.)
He added that "[s]taying on-task [was] kind of a problem. (*Id*. at 60-61.) When asked to explain
his inability to concentrate, he stated that he had been easily side-tracked since his accident and
"easily taken away" from those things that he was expected to do at any given time." (*Id*.)

> The ALJ then asked Plaintiff:
>
> Suppose you had a job . . . where you didn't have to deal with the public at all and
> you only had to deal with supervisors or your co-workers occasionally; you weren't
> part of any team effort and the job was very simple, routine, repetitive stuff where
> you do the same thing all day every day; but you had to maintain excellent
> [attendance] missing no more than one day a month, and when you went to work you
> had to stay on the job eight hours a day with the exception of very brief scheduled
> work breaks. Do you think you could handle a job like that and if you don't tell me
> the problems that you feel would keep you from maintaining a job with the timeline
> described.

(AR at 61.) Plaintiff responded:

> No. I - - I've always felt capable of doing a lot more than - - than something of that
> nature. I - - variety and - - and - - and - - something meaningful has always been
> what I wanted to do. But it seems as though I'm hampered by - - by - - after a certain
> amount of time in a certain work environment I, you know, think that - - I think there
> are times when I think I can do more.

(AR at 61.)

After a back and forth between the ALJ, Plaintiff, and Plaintiff's counsel, the ALJ posed
hypothetical questions to the vocational expert. (AR at 81.) Given the RFC posed to the vocational
expert, she testified that jobs existed in the economy that someone with the RFC could perform. (*Id*.
at 84.) The vocational expert testified that there is no conflict that she was aware of between her
testimony and anything contained in the Dictionary of Occupational Titles. (*Id*. at 84.)

The ALJ then explored his question to the vocational expert. (AR at 84.) The ALJ asked
the vocational expert "how long would a person have to pay attention, even to these simple tasks,

in a row?  How long in a row would they have to be able to pay attention; for what period of time?"

(*Id.*) The vocational expert answered that such a person would "still require the ability to maintain

attention to task, but not focus for extended periods of time.  They would have to be able to carry

out short and simple instructions and be able to understand and remember short and simple

instructions." (*Id.* at 84-85.)  The ALJ and vocational expert then discussed how concentration and

down time or a set time that a person could be 'off-task' could be quantified.  (*Id.* at 85.)  The

vocational expert stated that there was no way to define a certain percentage of downtime.  (*Id.* at

85-86.)  Plaintiff's counselor probed the vocational expert whether there had to be a bottom line

number regarding concentration.  (*Id*. at 86.)  The vocational expert testified that vocational experts

used to quantify concentration, but that there was "nothing" to back that number up.  (*Id.*)  The

vocational expert then stated that, what the issue boiled down to was whether the person could

attend to his task.  (*Id.*)  If the person was unable to attend to his tasks so much that he was unable

to complete his duties, then that would preclude working.  (*Id.* 86-87.)

### 4.    Record evidence

On November 28, 2006 Plaintiff filled out a disability report and had a disability interview

conducted.  (AR at 178.)  The interviewer conducted the interview with Plaintiff face-to-face.  (*Id.*)

The interviewer did not observe any difficulty with Plaintiff's ability to concentrate, talk, or his

ability to be coherent.  (*Id*. at 179.)  The interviewer did note that Plaintiff had difficulty answering.

(*Id.*)

On the disability report, Plaintiff stated that his memory loss and mood disturbance limited

his ability to work, because they affected his interpersonal relationships and his ability to maintain

employment. (AR at 182.) Plaintiff added that he had a marked difficultly with remembering details,

maintaining pace and being able to remain focused.  (*Id.*)  He also added that he had difficultly regulating and maintaining his mood; and he added that this regulation difficulty interfered with his personal and professional relationships.  (*Id.*)

On December 29, 2006 John Loring, a social worker who had known Plaintiff for two months, filled out a third party function report form. (AR at 190.) Loring stated that "[Plaintiff] has significant difficultly maintaining appropriate social relationships due to a since [sic] of entitlement and cognative [sic] impairments due to his head injury." (*Id*. at 191.)  Loring also stated that Plaintiff did not have appropriate grooming and often appeared disheveled and lacked an awareness of need to care for his personal appearance.  (*Id.* at 192.)  Loring also noted that Plaintiff was "unaware of his need for treatment including medication to improve his symptoms of mental illness resulting from his head injury."  (*Id.*)

Loring addressed Plaintiff's meal making ability.  (AR at 192.)  Loring stated that Plaintiff was able to make meals for himself, but that making the meal took Plaintiff two hours because of his inability to focus.  (*Id.*)  Loring noted that Plaintiff did not maintain a clean apartment and that the uncleanliness was due to Plaintiff becoming easily distracted with completing a task.  (*Id.*)  Plaintiff did his own shopping, Loring reported, but Loring also stated that shopping took Plaintiff three to four hours "if he is distracted," but only ten to fifteen minutes "if he is hyper[-]vigillant." [sic] (*Id*. at 193.)  Loring reported that Plaintiff could not pay bills, handle a savings account, or use a checkbook/money orders.  (*Id.*)  Loring also reported that Plaintiff enjoyed hanging out with people, which he did daily, and also enjoyed going to stores, clubs, and community centers.  (*Id*. at 194.) Loring stated that Plaintiff needed reminders to go places and that he got distracted and easily forgot appointments "when he [wa]s busy doing multiple tasks." (*Id.*)  Loring also stated that

9

Plaintiff had difficulty "maintaining appropriate social relationships to connections due to a belief that he is . . . 'special'[.]" (*Id*. at 195.)  Loring then stated that Plaintiff was unable to engage in social relationships due to cognitive impairments and entitlement due to his head injury."  (*Id.*)

Loring checked boxes that indicated that Plaintiff had problems with: memory; completing tasks; concentration; understanding; following instructions; and getting along with others.  (AR at 195.) Loring stated that Plaintiff could follow written instructions fairly well but that Plaintiff would often complete information incorrectly by being distracted with what "the point is behind this." (*Id.*) Loring stated that Plaintiff followed spoken instructions poorly, given his "marked" difficulty processing information/instructions due to cognitive impairments.  (*Id.*)

Loring stated that Plaintiff got along "poorly" with authority figures due to his paranoia and delusions of grandeur. (AR at 196.)  Loring added that Plaintiff did not handle stress well.  (*Id.*)

On his disability report, Plaintiff stated shopping took him the "normal amount of time." (AR at 205.)  Regarding money questions, Plaintiff stated that he could not pay bills, handle a savings account, or use a checkbook, but the reason he gave for this inability was that he had "no money." (*Id.*)  But Plaintiff indicated that he followed both written and spoken instructions "fairly well." (*Id*. at 207.)  Plaintiff also stated that he could pay attention "as long as needed." (*Id*. at 207.) Plaintiff stated that his ability to handle stress and ability to handle changes in routine depended upon the situation.  (*Id*. at 208.)

Arnett Chisholm, Dean of Admissions at Washtenaw Community College, sent in a "Certification" in support of Plaintiff's disability. (AR at 226.) Chisholm stated that he was a friend of Plaintiff's father and had been aware of Plaintiff's injuries since 2004.  (*Id.*)  He also stated that Plaintiff had exhibited behavior that interfered seriously with his academic progress, "even though

he did achieve good grades for two semesters." (*Id.*) Chisholm noted that Plaintiff exhibited a grandiose behavior when the two met to discuss Plaintiff's academic progress. (*Id.*) Chisholm opined that Plaintiff could not have worked while he was at school. (*Id.*) Chisholm added that Plaintiff seemed to have "no understanding of his limitations and difficulties." (*Id*. at 227.)

Harlan Turner, a former employer, also offered a statement. (AR at 230.) He stated that he had an argument with Plaintiff over monetary and personal issues. (*Id.*) Turner stated that Plaintiff made a "scene" in front of customers over the disagreement. (*Id.*)

A September 16, 2004 Eisenhower Center initial report shows that Plaintiff was a "very sociable individual," but that he had "decreased impulse control and judgment, poor initiation and follow through, manipulative behaviors, short-term memory deficits, impaired problem solving skills and abstract thinking." (AR at 271.) Another initial report, dated October, 2004, shows that Plaintiff was able to take care of all his hygiene and personal needs, but that he needed assistance with food shopping and supervision for all higher level cooking functions. (*Id*. at 286.) This report also shows that Plaintiff needed supervision in the community and someone to follow up with him about household cleanup. (*Id*. at 287.) The report shows that Plaintiff could handle his own money. (*Id*. at 288.) Another Eisenhower Center report shows that Plaintiff was doing well with his social behavior. (*Id*. at 284.) The report shows that Plaintiff was able to go on outings to the bowling alley, the movies, the grocery store, and the bookstore without any inappropriate behavior. (*Id*.)

In December, 2004 the Eisenhower Center completed a discharge psychological/behavioral analysis of Plaintiff. (AR at 347.) The discharge report shows that Plaintiff was fully able to socialize with others. (*Id*.) The report shows that Plaintiff was cooperative, although not entirely considerate of others all the time. (*Id*.) The report notes that Plaintiff was able to follow rules,

11

understand, and articulate, even if his willingness was not always entirely there.  (*Id*. at 348.)  The report expresses the opinion that Plaintiff did not have any mood disorders upon discharge.  (*Id*. at 350.)  But the report noted that, even on discharge, Plaintiff continued to need support with prioritizing task demands and appropriately responding when challenged.  (*Id*.)  The report further noted that Plaintiff needed some help with problem solving.  (*Id*. at 351.)  But the report also stated that Plaintiff had no thought disorder and was able to show mood and behavior consistent with the situation. (*Id*. at 352.)  A discharge summary also shows that Plaintiff had some improvement in concentration but that his attention abilities continued to be a marked obstacle that interfered with him socially, academically, and vocationally.  (*Id*. at 355.)  The discharge report also states that the center did not recommend that Plaintiff return to college classes until his attention and social judgment improved significantly.  (*Id*. at 357.)

A January to February, 2005 reassessment from University of Michigan Hospital & Health Centers, Occupational Therapy notes that Plaintiff's time management and organization skills continued to be problematic.  (AR at 392.)  Yet the report shows that Plaintiff did not want to use compensatory strategies to manage his issues.  (*Id*.)  The report also notes that Plaintiff displayed poor memory skills and problems with reasoning and problem solving.  (*Id*.)  The report also shows that Plaintiff was impaired in the following areas: sustained attention/concentration; selective attention; spatial relations; constructional skills; immediate recall memory; short term memory; long term memory; cognitive flexibility; planning and organization; problem solving; self monitoring/regulation; initiation; insight; remembering to remember.  (*Id*. at 393.)

On November 6, 2006 Plaintiff had an initial psychiatric evaluation with the Washtenaw County Project Outreach. (AR at 432.)  Dr. Florence, a psychiatrist, conducted the evaluation.  (*Id*.)

12

The evaluation shows that Plaintiff reported that he needed help with anger management. (*Id.*) The evaluation also shows that Plaintiff described himself as idealistic and reactive. (*Id.*) The evaluation also shows that Plaintiff stated that his anger outburst are triggered by encounters. (*Id.*) Dr. Florence formed the impression that Plaintiff had a "grandiose sense of self importance, [and that he was] preoccupied with belief of unlimited future success." (*Id.*) Dr. Florence also noted that Plaintiff stated that he believed he was special/unique and that he had a sense of entitlement and arrogant behaviors that was not "clearly associated with [traumatic brain surgery] or primary mood disorder." (*Id.*)

In January, 2007 Thomas M. Horner, a psychologist, conducted a cognitive-intellectual assessment on Plaintiff. (AR at 437.) Horner stated that Plaintiff "underwent testing in an alert and well motivated manner." (*Id.*) Horner added that Plaintiff was "persistent in his efforts, even when thwarted by the difficulties of relatively elementary problems." (*Id.*) Horner noted that Plaintiff had relaxed mood and communication and that his attention was appropriately focused and sustained to tasks. (*Id.*) Horner also noted that Plaintiff's speech was clear and his range of verbal self-expression was consonant [sic] with measured intelligence." (*Id.*)

Horner stated that Plaintiff had a lot of friends, but that Plaintiff was unable to sustain relationships for very long. (AR at 442.) Horner stated that Plaintiff enjoyed playing basketball, drinking, smoking, watching movies, going to dinner with his friends. (*Id.*)

Horner formed the impression that Plaintiff's degree of autonomy/dependency was "variable," his motivation was "adequate but likely digressive, unstructured," and that his tolerance for change was "adequate." (AR at 444.)

Horner evaluated Plaintiff's memory.  (AR at 446.)  He found that Plaintiff was able to repeat five digits forward and three backward, could recall three of three objects after three minutes, could name four presidents in the past fifty years, his birthday, and the schools he attended.  (*Id*.)

Horner summarized that Plaintiff had organic cognitive disorder and personality dysfunction along with alcoholism and marijuana dependence.  (AR at 449.)

Leonard C. Balunas, Ph.D., completed a mental residual functional capacity assessment of Plaintiff.  (AR at 453.)  Balunas recorded that Plaintiff was "moderately limited" in the following areas: the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; and the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (*Id*. at 453-54.)  Balunas recorded Plaintiff as "not significantly limited" in the following areas: the ability to carry out very short and simple instructions; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to sustain an ordinary routine without special supervision; the ability to work in coordination with or proximity to others without being distracted by them; the ability to make simple work-related decisions; the ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to ask simple questions or request assistance; the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  (*Id*.)  Balunas recorded that Plaintiff was also not significantly limited in areas of adaptation.  (*Id*. at 453.)

14

Balunas found "moderate": restriction in activities of daily living; difficulties in maintaining social function; and difficulties in maintaining concentration, persistence, or pace. (AR at 481.)

On March 25, 2009 Plaintiff was evaluated by Saint Joseph Mercy Health System. (AR at 628.) The report shows that Plaintiff was unable to answer questions during the interview, so the information in the report was provided by Plaintiff's father. (*Id.*) The mental status examination shows that Plaintiff was oriented to person and place, but was unable to answer what day or time it was. (*Id*. at 629.) The evaluator also stated that Plaintiff could not answer what his mood was and had a flat affect. (*Id.*) The evaluator also noted that Plaintiff had coherent speech, but was not logical. (*Id.*) The evaluation shows that Plaintiff was not able to participate in the interview process and appeared to be responding to internal stimuli. (*Id.* at 630.) The evaluation also shows that Plaintiff experienced racing thoughts and had difficulty communicating his needs to others. (*Id*. at 647.) The evaluation shows that Plaintiff also had difficulty sleeping and that he was anxious. (*Id.*)

Plaintiff received treatment from Washtenaw Community Health Organization from January, 2007 to April, 2009. These records show that Plaintiff had substance abuse issues, mixed mood symptoms, reactive anger, grandiosity, and narcissistic traits. (AR at 714.) The records show that Plaintiff had mild inattention to self; very mild feelings of depression; questionable inability to form friendships; very mild/somewhat vague conceptual disorganization that would cause "doubtful" clinical significance; and very mild unusual thought content. The records also show that Plaintiff used marijuana regularly, described himself as bored, hoped for employment, reported that his mood was "ok" and that he was sleeping "ok." (*Id.* at 723.) Those records also show that Plaintiff occasionally felt depressed, denied anger control problems, and had no over delusional content. (*Id.*) One record indicated a moderate reduction in Plaintiff's desire to initiate social contacts. (*Id*. at

15

725.)  The records indicate varying scores related to emotions, depression, anxiety, social drive, etc. throughout Plaintiff's treatment.  (*Id*. at 734.)  These records also show Plaintiff's progress in group therapy.  The group therapy records show that Plaintiff participated in group therapy with various amounts of insight into both his own condition and others'.

**B.     Standards**

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions.   Judicial review under this statute is limited to determining whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner's decision employed the proper legal standards.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997).  Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528.  It is not the function of this Court to try cases, resolve conflicts in the evidence or decide questions of credibility.  *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the Court must examine the administrative record as a whole.  *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981).  If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion.  *See Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d

16

535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts").

### 1.     Framework for social security disability determinations

Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis.  In the first four steps, Plaintiff was required to show that:

1.  he was not presently engaged in substantial gainful employment; and
2.  he suffered from a severe impairment; and
3.  the impairment met or was medically equal to a "listed impairment;" or
4.  he did not have the residual functional capacity to perform his relevant past work.

*See* 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f).  If Plaintiff's impairments prevented her from doing her past work, the Commissioner, at step five, would consider her residual functional capacity ("RFC"), age, education and past work experience to determine if she could perform other work. If she could not, she would be deemed disabled.  *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).  The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform."  *Her*, 203 F.3d at 391.  To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs."  *Varley v. Sec'y of Health and Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987) (citation omitted).  This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'"  *Id.* (citations omitted).

### C.     Analysis

Plaintiff puts forth three arguments why the Court should remand the case for further

17

considerations.  Plaintiff first argues that the RFC and hypothetical question failed to accurately account for Plaintiff's moderate difficulties in concentration, persistence, or pace.  Plaintiff then argues that the hypothetical question failed to account for Plaintiff's severe difficulties in social functioning.  Plaintiff finally argues that the ALJ failed to account for discrepancies between the vocational expert's testimony and the Dictionary of Occupational Titles.

### 1.   The RFC accounts for Plaintiff's impairments with concentration, persistence, or pace

Plaintiff argues that the ALJ's RFC and the hypothetical question posed to the vocational expert failed to account for the ALJ's finding that Plaintiff had moderate difficulties in concentration, persistence or pace. (Dkt. 11, Pl.'s Mot. for Summ. J. at 3.)  Due to this alleged failure, Plaintiff requests that the Court remand the case for a reconsidered RFC that includes an accurate portrait of Plaintiff's moderate impairment in concentration, persistence or pace. (*Id.* at 4.)

Plaintiff acknowledges that the ALJ's RFC went beyond the "simple, routine, unskilled" job limitation that some courts in this circuit and district have found insufficient, but Plaintiff argues that the ALJ's additional limitations "against strict production quotas does not properly account for Plaintiff's limitations in the current case." (Pl.'s Mot. at 4.)

Plaintiff argues that the "ALJ properly accounted for [] Plaintiff's difficulties in understanding, remembering, and carrying out detailed instructions; [but the ALJ] did not properly account for [] Plaintiff's difficulties in maintaining attention and concentration for extended periods, as found by the psychological expert." (Pl.'s Mot. at 5.)  Plaintiff also argues that the ALJ did not "accurately account for [] Plaintiff's limitations in the proper completion of tasks." (*Id.* at 6.)

Here, the ALJ limited Plaintiff:

to perform work at any exertional level that does not require: more than simple,

18

routine, repetitious tasks, with one- or two-step instructions; or strict production quotas, defined as the requirement to produce a specified number of units of work in a specified period of time; or more than occasional contact with coworkers, supervisors, or the public.

Plaintiff argues that the limitation to no strict production quotas does not align with Plaintiff's moderate difficulties in concentration, persistence, or pace. (Pl.'s Mot. at 4.) Despite Plaintiff's argument regarding his IQ and GAF scores, substantial evidence exists to support the ALJ's RFC. Again, the issue is not whether all the evidence supports the ALJ's conclusion, the issue is where enough evidence exists that a reasonable person could find the ALJ's decision reasonable.

Here, as Defendant points out, substantial evidence supports the ALJ's RFC. The November 28, 2006 disability report shows that the interviewer did not observe that Plaintiff had any difficulty concentrating. (AR at 178.) On another disability report, Plaintiff himself reported that he could pay attention "as long as needed" and was able to follow written and spoken instructions "fairly well" and that he had a varying ability to handle stress and changes in routine. (*Id*. at 207-08.) Horner's cognitive-intellectual assessment of Plaintiff is also substantial evidence. Horner noted that Plaintiff tested in an "alert and well motivated manner." (*Id*. at 437.) Horner also noted that Plaintiff was "persistent in his efforts, even when thwarted by the difficulties of relatively elementary problems." (*Id*.) Horner additionally pointed out that Plaintiff had a relaxed mood and that his attention was appropriately focused and sustained to tasks. (*Id*.) Horner also recorded decent results in testing Plaintiff's memory. (*Id*. at 446.) As shown above, Balunas completed a mental residual functional capacity assessment for Plaintiff and found that Plaintiff was not significantly limited in many areas and only moderately limited in the ability to maintain attention and concentration for extended periods. (*Id*. at 453.)

19

Because these records show that Plaintiff could complete tasks and self-reported that he could pay attention as long as he needed, the Court recommends finding that the ALJ did not err when he reasoned that Plaintiff could work doing simple, routine, repetitive tasks, with one- or two-step instructions with no production quotas and limited interaction with others.  Plaintiff argues, but does not suggest how, the ALJ could have structured a more limited RFC.

Given these statements and records, the Court finds that, although evidence exists to support the opposite conclusion, substantial evidence exists to support the ALJ's RFC, and therefore his question to the vocational expert, which served to reasonably deny Plaintiff his benefits request.

### 2.     Substantial evidence supports the ALJ's finding regarding Plaintiff's social functioning

Plaintiff argues that the ALJ's hypothetical did not account for Plaintiff's severe limitations in social functioning.  In support of this position, Plaintiff argues that the ALJ did not comply with SSR 06-03p when he failed to thoroughly address three specific "other sources"–Chisholm, Turner, and Loring and their statements.  (Pl.'s Mot. at 7.)  Plaintiff explains that the state agency examiner found that Plaintiff could only have "minimal" contact with supervisors, coworkers, and the public while the ALJ, in his RFC, stated that Plaintiff could have "occasional" contact with supervisors, coworkers, and the public. (*Id.* at 9.)  Plaintiff suggests that this difference, and given the fact that the ALJ did not address Chisholm, Turner, and Loring's opinion, requires remand.  (*Id.* at 10.)

Plaintiff first argues that the ALJ failed to apply SSR 06-03p in evaluating Chisholm, Turner, and Loring's opinions.  That ruling states that there are certain factors an ALJ may weigh when looking at opinions from non-medical sources.[3]  Those factors are:

---

[3]"For opinion from sources . . . who are not medical sources . . . it would be appropriate to consider such factors as the nature and extent of the relationship between the source and the

- how long the source has known and how frequently the source has seen the individual;
- How consistent the opinion is with other evidence;
- The degree to which the source presents relevant evidence to support an opinion;
- How well the source explains the opinion;
- Whether the source explains the opinion;
- Whether the source has a specialty or area of expertise related to the individual's impairment(s); and
- Any other factors that tend to support or refute the opinion.

2006 WL 2329939 at * 4-5. Despite Plaintiff's argument, though, that the ALJ must thoroughly examine those opinions, "SSR 06-3p is phrased in permissive rather than mandatory terms[.]" *Vanportfliet v. Comm'r*, 10-578, 2012 WL 1345315, at *15 (W.D.Mich Mar. 26, 2012) *adopted by* 2012 WL 1345305. *See Austin v. Astrue*, 10-14159, 2012 WL 1970227, at *9 (E.D.Mich. Mar. 19, 2012) *adopted by* 2012 WL 1970449 (holding that, under SSR 06-03p, while the ALJ should have discussed the other source opinion, remand was not required because the ALJ's decision "provide[d] a sufficiently detailed analysis to allow the reader to follow his decision, and to know that remand

---

individual, the source's qualifications, the source's area of specialty or expertise, the degree to which the source presents relevant evidence to support his or her opinion, whether the opinion is consistent with other evidence, any other factors that tend to support or refute the opinion." 2006 WL 2329939  at *5.

"Since there is a requirement to consider all relevant evidence . . . the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity. Although there is no distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decisions allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.  In addition, when an adjudicator determines that an opinion from such a source is entitled to greater weight than a medical opinion from a treating source, the adjudicator must explain the reasons in the notice of decision in hearing cases and in the notice of determination . . . at the initial and reconsideration levels, if the determination is less than fully favorable."  *Id*. at *6.

21

to consider the [other source] in the record would not change the case's outcome.") (citation omitted).

Here, the ALJ expressly mentioned the opinions, stated that they were not consistent with the record and then went on to analyze the evidence that he found supported his holding. The Court recommends finding that these express statements coupled with the ALJ's analysis is sufficient to comply with SSR 06-03p.

Plaintiff then argues that the ALJ erred in formulating his hypothetical question to the vocational expert because the ALJ stated that Plaintiff could have "occasional" contact with supervisors, coworkers, or the public, when the state agency examiner found that Plaintiff could only have "minimal" contact. (Pl.'s Mot. at 9.) But Plaintiff does not offer any argument as to how "occasional" so vastly differs from "minimal." As Defendant point out, though, SSR 83-10 defines "occasionally" as "occurring from very little up to one-third of the time." SSR 83-10, 1983 WL 31251, at *5. Here, the "minimal" limitation is included in the "occasional" limitation. The Court therefore recommends rejecting this argument.

Here, evidence exists that Plaintiff did have some issues with social functioning: Loring's statement; Chisholm's statement; and Turner's statement. But evidence also exists that Plaintiff did well with social behavior, was able to go on outings to bowling alleys, the movies, the grocery store, and the bookstore without any inappropriate behavior. (AR at 288, 284.) Plaintiff was also noted to be able to fully socialize with others. (*Id*. at 347.) A psychologist, in 2007, also reported that Plaintiff had a lot of friends, although he was not able to sustain such friendships for long. (*Id*. at 442.) But that same psychologist also reported that Plaintiff enjoyed playing basketball, drinking, smoking, watching movies, and going to dinner with friends. (*Id.*) Group therapy records also

showed that Plaintiff participated in group therapy classes with various amounts of insight into both his own condition and others'. (*Id.* at 734.)  *See Hogg v. Sullivan*, 987 F.2d 328, 333 (6th Cir. 1993) (holding that the plaintiff did not have marked difficulties in social functioning when she attended church and visited relatives.).

The Court therefore recommends finding that substantial evidence exists to uphold the ALJ's determination that Plaintiff had moderate difficulties in social functioning and that substantial evidence exists that supports the RFC and the hypothetical question posed to the vocational expert.

### 3.    The ALJ complied with SSR 00-4p's requirements

Plaintiff's third argument is that the ALJ did not meet the requirements of SSR 00-4p when "he did not elicit a reasonable explanation for a conflict between the DOT and the Vocational Expert's testimony." (Pl.'s Mot. at 10.)  Regardless of the merit of Plaintiff's argument, the Sixth Circuit has foreclosed the argument in situations as the one presented here.  The Sixth Circuit has held that  "[t]he ALJ fully complied with SSR 00-4p when he asked the VE whether there was 'any discrepancy between [her] opinions and the DOT standards for the requirements for the jobs [she] named.'" *Beinlich v. Comm'r*, 345 F.App'x 163, 168 (6th Cir. 2009) (citation omitted, insertions in original).  "The ALJ is under no obligation to investigate the accuracy of the VE's testimony beyond the inquiry mandated by SSR 00-4p." *Id.* (citation omitted).  "This obligation falls to the plaintiff's counsel, who had the opportunity to cross-examine the VE and bring out any conflicts with the DOT.  The fact that plaintiff's counsel did not do so is not grounds for relief." *Id.* (citation omitted).

Here, the ALJ asked the vocational expert: "[i]s there a conflict that you're aware of between your testimony on these other jobs and anything contained in the Dictionary of Occupational Titles?" (AR at 84.)  Plaintiff's counsel did not inquire about any discrepancies.  Given the ALJ's

23

question and Plaintiff's counsel's failure to elicit any discrepancy, the Court recommends finding that Sixth Circuit precedent requires rejection of Plaintiff's third argument.

### D.      Conclusion

For the above-stated reasons, the Court recommends denying Plaintiff's motion for summary judgment, granting Plaintiff's motion for summary judgment, and dismissing this case.

## III.    Notice to Parties Regarding Objections

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n Of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Any objections must be labeled as "Objection #1," "Objection #2," etc.  Any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains.  Not later than ten days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity.  The response must specifically address

24

each issue raised in the objections, in the same order and labeled as "Response to Objection #1,"

"Response to Objection #2," etc.

Dated: July 26, 2012                    s/ Mona K. Majzoub
                                               MONA K. MAJZOUB
                                               UNITED STATES MAGISTRATE JUDGE

## PROOF OF SERVICE

I hereby certify that a copy of this Report and Recommendation was served upon

Counsel of Record on this date.

Dated:  July 26, 2012                    s/ Lisa C. Bartlett
                                               Case Manager